UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BOZENA SARNECKA-CROUCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 06-1169 (ESH/JMF) |
| ) | |
| JAMES BILLINGTON, ) | |
| LIBRARIAN OF CONGRESS, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

**MEMORANDUM OPINION**

Now pending before the Court is <u>Plaintiff's Notice of Motion and Motion to Reopen and to Enforce the Stipulation of Settlement and Dismissal</u> [#50]. For the following reasons, plaintiff's motion will be granted insofar as the Court concludes that, as the defendant concedes, it has jurisdiction to enforce the settlement agreement and that it should exercise ancillary jurisdiction over plaintiff's claim for damages for the asserted delay in the defendant's complying with the terms of the settlement agreement.

<u>Background</u>

1. This case settled on September 24, 2009. <u>Stipulation of Settlement and Dismissal</u> [#48].

2. Pursuant to the settlement agreement, defendant agreed to pay plaintiff a total sum of two hundred seventy five thousand ($275,000) dollars. <u>Id.</u> at 1.

3. Of that total sum, $150,000 was to be paid by the Library of Congress directly in two installments, in the following manner: 1) defendant was to promote plaintiff to grade GS-15 step 10 level retroactive to October 20, 2005, and apply a portion of the settlement

    payment to fund the cost of plaintiff's increased retirement benefits, which defendant initially estimated to be $89,000; 2) defendant was to pay the remainder of the settlement payment to plaintiff as a lump sum payment; 3) defendant was to amend plaintiff's personnel folder to reflect her reinstatement and promotion; and 4) defendant was to pay both its and plaintiff's mandatory contributions that were to be attributable to plaintiff's reinstatement and promotion, including Social Security, the Federal Employees Retirement System ("FERS"), Medicare and all "breakage" as defined in 5 C.F.R. § 1605.1(b),[1] associated with plaintiff's Thrift Savings Plan account. Id. at 3.

4. Additionally, defendant was to ensure that plaintiff would be able to retire from the federal service with plaintiff's length of service at the grade GS 15 step 10 level, measured from October 20, 2005. Id.

5. The language at issue in the settlement concerning the retroactive promotion and reinstatement of plaintiff at GS-15 step 10 level reads as follows:

> Reinstatement and Retroactive Promotion. Defendant shall amend plaintiff's Official Personnel Folder to reflect her reinstatement as a Library employee and promotion to the grade GS-15 step 10 level, retroactive to October 20, 2005. Plaintiff shall not receive any back pay, cost-of-living increases, or other payments, over and above the settlement payment in paragraph 1 hereof, on account of this retroactive promotion; provided, however, that defendant shall pay: (I) both the agency's and the plaintiff's mandatory contributions that are attributable to plaintiff's reinstatement and retroactive promotion, including, but not limited to, Social Security, the Federal Employees Retirement System, medicare, and the Thrift Savings Plan, and (ii) all "breakage," as defined in 5 C.F.R. § 1605.1(b), associated with plaintiff's Thrift Savings Plan account, as determined by the Federal Retirement Thrift

---

[1] All references to the United States Code are to the electronic versions in Westlaw or Lexis.

>Investment Board. Defendant shall also take all other steps necessary on defendant's part to enable plaintiff to retire from the federal service with plaintiff's length of service at the grade GS-15 step 10 level, measured from October 20, 2005. These steps shall include, but are not limited to, initiation of the process of re-coding plaintiff's employment data to effectuate her reinstatement and retroactive promotion.

[#48] at 3.

6. On November 20, 2009, defendant's counsel notified plaintiff's counsel that the actual cost of mandatory contributions necessary to fund plaintiff's increased retirement benefits was actually $99,550.26, and plaintiff received a lump some payment for $51,449.74 on November 27, 2009. [#50] at 4-5.

7. On December 8, 2009, plaintiff's counsel received an email from defendant's counsel stating that the "final cost calculation was conservative (and the final cost amount was actually more than $99,000). However, the Library authorized payment of the $51,449.74 [and plaintiff] will receive no reduction in the agreed-upon benefits as a result of the greater cost to the library." Id. at 5 (internal citation removed).

8. On May 24, 2010, plaintiff's counsel was informed by defendant's counsel that the final cost was in fact $132,178.25. Id.

9. Plaintiff first received an increase in her FERS benefit in 2010. Id.

10. Plaintiff received W-2 forms for years 2006-2009 that reflected Social Security and Medicare income and withholdings consistent with the settlement agreement, except for the year 2009 W-2, which was slightly less than the amount that should have been reported. Id. at 5-6.

11. On May 24, 2010, counsel for defendant informed plaintiff that defendant had paid the

required Social Security contributions. Id. at 6.

12. On July 15, 2010, defendant provided a declaration showing that it had made payments for the years 2006 through 2009 to "FERS, [medicare], [Old Age, Survivors, and Disability Insurance], [and Thrift Savings Plan]." Id. at 6 (internal quotation removed).

13. When the Social Security Administration ("SSA") performed its annual recalculation of plaintiff's Social Security benefit, however, she received a substantially smaller benefit than she should have. Id.

14. In November, 2010, the SSA provided to documentation to the plaintiff that showed that defendant reported $82,057.60 in wages for plaintiff in 2009, but no wages for the years 2006-2008. Id.

15. On January 7, 2011, plaintiff filed a request for reconsideration of her benefit, which was denied. Id.

16. On April 8, 2011, plaintiff subsequently filed a request for a hearing of her claim before an administrative law judge, which is currently pending. Id.

17. The SSA subsequently issued a Notice of Change of benefits for plaintiff informing her that she would receive an additional benefit increase beginning in May, 2011, as well as a lump sum payment to make the increase retroactive to June, 2007. Id. at 7.

18. On March 7, 2011, counsel for plaintiff sent a letter to defendant requesting that it comply with the terms of the settlement with regards to the Social Security related obligations and on April 25, 2011, counsel for defendant replied, stating that it believed that it could not report plaintiff's 2006-2009 wages as Social Security income. Id.

19. Counsel for plaintiff requested clarification of defendant's position in light of the W-2

forms plaintiff had received and the declaration provided by defendant stating that it had made contributions to, among other things, Social Security, and to justify the deductions it made from the lump sum payment. Id. at 8.

20. On July 10, 2011, defendant's counsel informed plaintiff's counsel that defendant had likely deducted too much from the lump sum payment and would provide a revised calculation. Id.

21. On July 14, 2011, the SSA provided plaintiff with additional documentation showing that she received the maximum benefit for 2006 and 2007, but that there was no income reported by defendant for 2008, and her 2009 wages were still reported at an amount slightly lower than the amount pursuant to the settlement. Id.

22. On August 2, 2011, instead of a revised calculation, defendant sent plaintiff a request that she remit $33,627.99, without any calculation in support of the request, and stated that: "The amount due is the overpayment due to the administrative error when entering the amount of the settlement agreement." Id. (internal quotation removed).

23. On August 15, 2011, defendant provided plaintiff with the revised calculations and took the position that it should not have paid $46,593.14 in Social Security contributions. Id. Defendant stated that as a result, the total cost of plaintiff's benefits should have been $85,585.81 not $132,177.95, and additionally, the lump payment should have been $64,415.19, not $51,449.74. Id. at 11.

24. Defendant characterized the lump sum payment as back pay and said that it had to pay Social Security taxes on it to the tune of $7,987.48. Id.

25. Defendant stated that it would pay those taxes, disburse to plaintiff $4,997.97, which it

believes was still owed to plaintiff, and would withdraw its request for payment of $33,627.99 if plaintiff accepted these revised calculations. Id.

## The Parties' Contentions

Plaintiff now moves to reopen the case and to enforce the stipulation of settlement by compelling defendant to (1) make all Social Security reporting and contributions for the years 2006 through 2009, and, to the extent that reporting to the SSA pursuant to the settlement cannot be made in part or in full, compensate plaintiff in an amount equivalent to her expected lifetime Social Security benefit increase resulting from the retroactive promotion and reinstatement; 2) produce documentation showing the amounts it has expended in connection with the retroactive promotion and reinstatement; 3) pay plaintiff the sum of $17,430, plus interest, as compensation for the unreasonable delays that she has experienced in securing her increased FERS benefit;[2] and 4) withdraw its notice to plaintiff to remit the amount of $33,627.99. [#50] at 1-2.

Defendant, conceding as it must, that it agreed that this Court should retain jurisdiction to enforce the terms of the settlement agreement submits that the Court solely has jurisdiction to determine the meaning of the term "mandatory contributions" in the settlement agreement as to Social Security contributions. Defendant's Response to Plaintiff's Motion to Reopen and to Enforce the Stipulation of Settlement and Dismissal [#55] at 1. The defendant therefore asks that the Court rule on the meaning of that term but dismiss the case "to the extent plaintiff seeks damages and other monetary relief." Id. at 11.

---

[2] Plaintiff asserts that she did not receive an increase in her FERS benefit until October 2010, nearly 11 months after the settlement was signed. As a result, plaintiff further asserts that defendant's delays in effectuating the benefit increase caused plaintiff losses of $1,245 per month, for total losses of $17,430 (plus interest) measured from August 1, 2009, her retirement date under the settlement. [#50] at 15.

**Analysis**

Under the Tucker Act, claims for damages against the United States in excess of $10,000, upon any express or implied contract with the United States, are under the exclusive jurisdiction of the Court of Federal Claims. 28 U.S.C. §§ 1346(a)(2), 1491(a)(1). A decision by the Federal Circuit has now made it clear beyond question that the Court of Federal Claims has jurisdiction to entertain a claim alleging a breach of a Title VII settlement agreement. Holmes v. United States, 657 F.3d 1303, 1312 (Fed. Cir. 2011). As that court noted, the court of appeals for this circuit certainly agrees. Id. (citing Greenhill v. Spellings, 482 F.3d 569, 575 (D.C. Cir. 2007)); Hansson v. Norton, 411 F.3d 231, 232, 237 (D.C. Cir. 2005). Accord: Rochon v. Gonzales, 438 F.3d 1211, 1214 (D.C. Cir. 2006); Allen v. Napolitano, 774 F. Supp. 2d 186, 196 (D.D.C. 2011).

Ancillary jurisdiction over a claim over which the court lacks jurisdiction is to be exercised "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 379-80 (1994). See Rochon v. Gonzalez, 438 F.3d at 1215 (even if primary thrust of claim is in contract, district court may assert ancillary jurisdiction over it if the claims are in varying respects and degrees factually interdependent). The settlement agreement here included a clause that stated, in part, "that the Court shall retain jurisdiction to enforce the terms of this Stipulation." [#48] at 5. The Court of Appeals for this circuit has ruled that when "the parties' obligation to comply with the terms of the settlement agreement [is] part of the order of dismissal-either by separate provision . . . or by incorporating the terms of the agreement in the order[;] a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the

agreement would therefore exist." Shaffer v. Veneman, 325 F.3d 370, 374 (D.C. Cir. 2003). The defendant understandably concedes this Court's jurisdiction to enforce the settlement agreement but balks at its awarding any monetary damages. The Court, however, should exercise ancillary jurisdiction "to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent." Kokkonen, 511 U.S. at 379. Surely, plaintiff's claims, insofar as they seek affirmative relief, are factually interdependent with her claims for damages.

Defendant cites Franklin-Mason v. Penn, 616 F. Supp. 2d 97 (D.D.C. 2009), in support of its argument that this Court does not have jurisdiction over this matter, at least with regards to plaintiff's request for $17,430. [#55] at 1. In Franklin-Mason, the district court rejected the plaintiff's claim of ancillary jurisdiction to enforce a settlement agreement. Id. at 101. In that case, the court found that it lacked the ability to exercise ancillary jurisdiction because the plaintiff had also filed a separate action, which encompassed all of the actions relating to her attempt to enforce the settlement, and not because the jurisdiction did not exist. Id. In the instant case, plaintiff has not made any other filings besides the present motion to reopen the case and enforce the terms of the settlement. As such, ancillary jurisdiction is appropriate. As the court indicated in Franklin-Mason: "[t]his court has no need to exercise ancillary jurisdiction over her breach claim to vindicate its authority or effectuate its decrees." Id. at 101. Here, as defendant has to concede, the Court must exercise jurisdiction to enforce its decree and it is equally legitimate to exercise ancillary jurisdiction over factually interdependent claims that would otherwise fall within the jurisdiction of the Claims Court.

Accordingly, the Court will exercise jurisdiction over the entire motion to reopen and the parties shall now turn to the merits of the controversy.

They shall meet and confer in person to see if they can arrive at a joint stipulation that there is no genuine issue as to the facts set out in paragraphs 1 to 25 of this Opinion.  If they agree they will attach to the joint stipulation a statement that the parties are agreed that the Court may resolve this matter as a matter of law. If they disagree and one or both of them believe that there are genuine issues of fact, either side shall file a statement specifying those issues and the need for any discovery before the court may proceed.  A status call will follow these submissions.

A separate Order accompanies this Memorandum Opinion.

_____
JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE